## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## TEXARKANA DIVISON

| | | |
|---|---|---|
| PINEY WOODS ER III, LLC, | § | |
| PINEY WOODS ER I, LLC, | § | |
| EXCEL ER PHYSICIANS EAST TEXAS, PLLC, | § | |
| AMERICA'S ER SITE 001, LLC, | § | |
| AMERICA'S ER SITE 002, LLC, | § | |
| WOODLANDS LONE STAR EMERGENCY | § | |
| PHYSICIANS GROUP, PLLC, | § | |
| ONYX INTERESTS, LLC, | § | |
| GEMINI EMERGENCY PHYSICIANS, PLLC, | § | |
| EROS, LLC, | § | **Cause No:  05:20-cv-00041-RWS** |
| EMERGENCARE OPERATOR, LLC, | § | |
| STC EMERGENCY PHYSICIANS, PA, | § | |
| STC OPERATIONS, LLC, MY ER STCPR, LP, | § | |
| UPTOWN ER, PLLC, MY ER ABILENE, LLC, | § | **JURY TRIAL DEMANDED** |
| THE LUBBOCK EMERGENCY ROOM, LLC, | § | |
| WTER QUAKER, LLP, | § | |
| LUBBOCK EMERGENCY PHYSICIANS, PA, | § | |
| PRIMECARE EMERGENCY CENTER – | § | |
| ARLINGTON, LLC, | § | |
| PRIMECARE EMERGENCY CENTER, PLLC, | § | |
| SPHIER EMERGENCY ROOM, LLC, | § | |
| SPHIER EMERGENCY ROOM | § | |
| MANAGEMENT, LLC, | § | |
| EMERGENCY ROOM PHYSICIANS OF | § | |
| SPHIER, PLLC, | § | |
| ST. MICHAEL'S EMERGENCY CENTER, LLC, | § | |
| BEAUMONT ELITE EMERGENCY | § | |
| CENTER, LLC, | § | |
| BEAUMONT ER PHYSICIANS, PLLC, | § | |
| SUGARLAND EMERGENCY PHYSICIANS, PA, | § | |
| EC PLANO, LLC, | § | |
| EMERGENCY MEDICAL GROUP, LLC, | § | |
| | § | |
| *Plaintiffs,* | § | |
| v. | § | |
| | § | |
| BLUE CROSS AND BLUE SHIELD OF TEXAS, | § | |
| A DIVISION OF HEALTH CARE SERVICE | § | |
| CORPORATION, A MUTUAL LEGAL | § | |
| RESERVE COMPANY | § | |
| *Defendant.* | § | |

1

## PLAINTIFFS' SECOND AMENDED COMPLAINT

Plaintiffs, Piney Woods ER III, LLC, Piney Woods ER I, LLC, Excel ER Physicians East Texas, PPLC, America's ER Site 001, LLC, America's ER Site 002, LLC, Woodlands Lone Star Emergency Physicians Group, PLLC, Onyx Interests, LLC, Gemini Emergency Physicians, PLLC, EROS, LLC, Emergencare Operator, LLC, STC Emergency Physicians, PA, STC Operations, LLC, MY ER STCPR, LP, Uptown ER, PLLC, My ER Abilene, LLC, The Lubbock Emergency Room, LLC, WTER Quaker, LLP, Lubbock Emergency Physicians, PA, Primecare Emergency Center – Arlington, LLC, Primecare Emergency Center, PLLC, Sphier Emergency Room, LLC, Sphier Emergency Room Management, LLC, Emergency Room Physicians of Sphier, PLLC, St. Michael's Emergency Center, LLC, Beaumont Elite Emergency Center, LLC, Beaumont ER Physicians, PLLC, Sugarland Emergency Physicians, PA, EC Plano, LLC, and Emergency Medical Group, LLC, (hereinafter, "Plaintiffs"), for themselves, and all others similarly situated, (hereinafter, the "Class"), and for their causes of action against Defendant, Blue Cross Blue Shield of Texas (hereinafter, "BCBS" or "Defendant"),  allege and state as follows:

1.      This litigation stems from the concerted effort by BCBS to systematically underpay free-standing emergency centers and their associated physician's groups for the life-saving care they provide in violation of state and federal law and the terms of BCBS' own insurance plans, in a concerted effort to drive them out of business.

2.      Specifically, both state and federal law require health insurers and administrators like BCBS to pay the "usual and customary rate" for emergency services provided by out of network providers, such as free-standing emergency centers and their associated physicians groups.  Further, BCBS' own insurance plans and the plans BCBS administers require coverage of insureds for emergency care including emergency care provided by out-of-network providers.

However, BCBS has repeatedly violated its obligations under Texas law, federal law, and the terms of its own plans to timely provide coverage at the usual and customary rate for BCBS members who present for emergency care at free-standing emergency centers.  BCBS' conduct potentially exposes patients to unnecessary financial obligations to these emergency service providers and deprives those providers to payments for which they are entitled under the law, driving many of these providers out of business.

3.      Plaintiffs bring this action to recover monies BCBS owes Plaintiffs and all similarly situated (1) free-standing emergency centers and (2) physicians groups providing services in free-standing emergency centers—*i.e.*, the Class—for its violation of state and federal law requiring it to properly administer, process, and pay claims for emergency care services.

## PARTIES

1.      Plaintiff Piney Woods ER III, LLC d/b/a Excel ER – Texarkana is a limited liability company organized and existing under the laws of the State of Texas that operated a free-standing emergency center.  Excel ER – Texarkana and/or Excel ER – Texarkana, LLC is the business name of the entity Piney Woods ER III, LLC.

2.      Plaintiff Piney Woods ER I, LLC is a Texas limited liability company who operated a freestanding emergency room doing business as Excel ER Tyler located in Tyler, Texas.

3.      Plaintiff Excel ER Physicians East Texas, PLLC is a professional limited liability company organized and existing under the laws of the State of Texas that operates a physicians group that provided emergency medical care at the facilities operated by Piney Woods ER III, LLC and Piney Woods ER I, LLC.

4.     Plaintiff America's ER Site 001, LLC is a Texas limited liability company who operates a freestanding emergency room doing business as America's ER located in Magnolia, Texas.

5.     Plaintiff America's ER Site 002, LLC is a Texas limited liability company who operates a freestanding emergency room doing business as America's ER located in Cypress, Texas.

6.     Plaintiff Woodlands Lone Star Emergency Physicians Group, PLLC is a Texas professional limited liability company who operates a physicians group providing emergency medical care at the facility operated by America's ER Site 001, LLC and America's ER Site 002, LLC .

7.     Plaintiff Onyx Interests, LLC is a Texas limited liability company who operates a freestanding emergency room doing business as Emergicare located in Houston, Texas.

8.     Plaintiff Gemini Emergency Physicians, PLLC is a professional limited liability company organized and existing under the laws of the State of Texas that operates a physicians group that provide emergency medical care at the facility operated by Onyx Interests, LLC.

9.     Plaintiff EROS, LLC is a Texas limited liability company who operates a freestanding emergency room doing business as ER on Soncy located in Amarillo, Texas.

10.     Plaintiff Emergencare Operator, LLC is a Texas limited liability company who operates a physicians group that provide emergency medical care at the facility operated by EROS, LLC.

11.     Plaintiff STC Emergency Physicians, PA is a professional association organized and existing under the laws of the State of Texas that operates a physicians group that provide emergency medical care at the facility operated by STC Operations, LLC in San Marcos, TX.

12.     Plaintiff STC Operations, LLC is a Texas limited liability company who operates a freestanding emergency room doing business as My Emergency Room 24/7 located in San Marcos, Texas.

13.     Plaintiff MY ER STCPR, LP is a Texas limited partnership who operated a freestanding emergency room doing business as My Emergency Room 24/7 located in San Antonio, Texas.

14.     Plaintiff Uptown ER, PLLC is a Texas professional limited liability company who operated a freestanding emergency room doing business as Uptown ER located in Dallas, Texas.

15.     Plaintiff My ER Abilene, LLC is a Texas limited liability company who operates a freestanding emergency room doing business as My Emergency Room 24/7 located in Abilene, Texas.

16.     Plaintiff The Lubbock Emergency Room, LLC is a Texas limited liability company who operated a freestanding emergency room doing business as West Texas ER located in Lubbock, Texas.

17.     Plaintiff WTER Quaker, LLP is a Texas limited liability partnership who operates a freestanding emergency room doing business as West Texas ER located in Lubbock, Texas.

18.     Plaintiff Lubbock Emergency Physicians, PA is a professional association organized and existing under the laws of the State of Texas that operates a physicians group that provide emergency medical care at the facilities operated by The Lubbock Emergency Room, LLC and WTER Quaker LLP.

19.     Plaintiff Primecare Emergency Center – Arlington, LLC is a Texas limited liability company who operates a freestanding emergency room doing business as PrimeCare Emergency Center located in Arlington, Texas.

20.     Plaintiff Primecare Emergency Center, PLLC is a professional limited liability company organized and existing under the laws of the State of Texas that operates a physicians group that provide emergency medical care at the facility operated by Primecare Emergency Center – Arlington, LLC.

21.     Plaintiff Sphier Emergency Room, LLC is a Texas limited liability company who operated a freestanding emergency room doing business as Sphier Emergency Room located in Katy, Texas.

22.     Plaintiff Sphier Emergency Room Management, LLC is a Texas limited liability company who operated a freestanding emergency room doing business as Sphier Emergency Room located in Missouri City, Texas.

23.     Plaintiff Emergency Room Physicians of Sphier, PLLC (dba Sphier ER Physicians PM, PLLC) is a professional limited liability company organized and existing under the laws of the State of Texas that operated a physicians group that provide emergency medical care at the facilities operated by Sphier Emergency Room, LLC and Sphier Emergency Room Management, LLC.

24.     Plaintiff St. Michael's Emergency Center, LLC is a Texas limited liability company who operates a freestanding emergency room doing business as St. Michael's Emergency Center located in Sugar Land, Texas.

25.     Plaintiff Beaumont Elite Emergency Center, LLC is a Texas limited liability company who operates a freestanding emergency room doing business as Beaumont Emergency Center located in Beaumont, Texas.

26.     Plaintiff Beaumont ER Physicians, PLLC is a professional limited liability company organized and existing under the laws of the State of Texas that operates a physicians

group that provide emergency medical care at the facilities operated by Beaumont Elite Emergency Center, LLC.

27.     Plaintiff Sugarland Emergency Physicians, PA is a professional association organized and existing under the laws of the State of Texas that operates a physicians group that provides emergency medical care at the facilities operated by St. Michael's Emergency Center, LLC.

28.     Plaintiff EC Plano, LLC is a Texas limited liability company who operates a freestanding emergency room doing business as Elitecare 24 HR Emergency located in Plano, Texas.

29.     Plaintiff Emergency Medical Group, LLC is a Texas limited liability company who operates a freestanding emergency room doing business as Elitecare Emergency Center located in Houston, Texas.

30.     Defendant Blue Cross and Blue Shield of Texas, a division of Health Care Service Corporation, a Mutual Legal Reserve Company is the largest health insurance provider in Texas. Upon information and belief, BCBS is a Mutual Legal Reserve Company organized under the laws of the State of Illinois, with its principal place of business located in Illinois. It operates a division that does business as "Blue Cross Blue Shield of Texas," located in Collin County, Texas and may be served by delivering a copy of the summons and of the complaint to an officer at its headquarters at 1001 E. Lookout Drive Richardson, Texas 75082.

## JURISDICTION AND VENUE

31.     The Court has personal jurisdiction over Defendant BCBS because it conducts substantial business in Texas and a substantial part of the events or omissions giving rise to the Plaintiffs' and the Class' claims occurred in Texas. Specifically, BCBS operates a division that

does business as "Blue Cross Blue Shield of Texas," headquartered in Texas, and is the largest health insurer in the State of Texas.  BCBS also serves as administrator for various health insurance plans provided by the State of Texas and various municipalities within Texas, and also administers and exercises control over the administration, processing, and payment of claims in Texas on behalf of its sister Blue-Cross entities in other States.[1]

32.    The Court has subject matter jurisdiction over this action pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because the Plaintiffs' and the Class' claims, in part, arise under Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq.  The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over the Plaintiffs' and the Class' state law claims, which do not arise under ERISA, because those claims are part of the same case or controversy.

33.    The Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1132, because the amount in controversy exceeds $75,000, exclusive of interests and costs, and this is a suit between citizens of different states. Plaintiffs and the Class are citizens of Texas. Defendant BCBS is a citizen of Illinois, because, upon information and belief, Defendant BCBS is a Mutual Legal Reserve Company organized under the laws of the State of Illinois, with its principal place of business located in Illinois.

---

[1] BCBS participates in the "Blue Card Program"—a national program that enables members of a Blue Cross and/or Blue Shield Plan ("Blue Plan") to obtain health care services while traveling or living in another Blue Plan's service area.  The Program allows a member to receive the benefits provided by their Home Plan while accessing the provider networks and savings from the Host Plan. When a member of an out-of-area Blue Plan receives medical services from a health care provider, the provider submits a claim to the local Host Plan, not the member's Home Plan.  The Host Plan validates the provider information and exercises control over the pricing applicable to the claim.  The Home Plan reviews the member's coverage and determines whether the member was eligible to receive the medical services rendered by the provider. The Host Plan then pays the provider. In other words, while the Home Plan determines whether the services are covered, the Host Plan controls the *amount* reimbursed for the service.

34.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and 29 U.S.C. § 1132(e)(2) because BCBS resides in this district. Venue is also proper in this district pursuant to 29 U.S.C. § 1132(e)(2), because this is the district "where the plan is administered, where the breach took place, or where a defendant resides or may be found."

## FACTUAL BACKGROUND

**A.     FECs Provide Critical Emergency Care to Texas Communities.**

35.     In 2009, the Texas legislature passed the Texas Freestanding Emergency Care Facility Licensing Act, which authorized the operation of free-standing emergency centers in Texas.  Plaintiffs are free-standing emergency centers and their associated physician groups that provide the necessary emergency medical care (collectively referred to herein as "FECs").  Like traditional hospital-based emergency departments, FECs provide 24/7 access to emergency care and are fully equipped and staffed to evaluate and treat medical emergencies.  However, and as the name suggests, these independently licensed FECs differ from traditional hospital-based emergency rooms in several important respects, including, that FECs do not have to be owned by or physically attached to a hospital.

36.     FECs provide a host of benefits to the communities they serve and fill an important gap in Texas's emergency healthcare safety net.  Because FECs are not required to be located near a "parent" hospital, they can be located in and provide medical treatment and/or stabilization for any emergency to communities without a nearby hospital.  This proximity to patients saves lives: when minutes matter most, patients can receive medical treatment from a local FEC rather than traveling dozens of miles to a hospital outside of their community. Indeed, FECs are an integral part of the emergency care safety net and have provided vital services when natural disasters, such as Hurricane Harvey, or seasonal or unexpected outbreaks, such as Coronavirus, have hit Texas.

37.     Further, FECs provide better, patient-driven care than traditional hospitals because they are unencumbered by the typical administrative bureaucracy and other challenges burdening hospital-based emergency departments. For instance, patients at FECs experience shorter wait times than at hospital emergency rooms, despite the fact that the proportion of total emergency department visits occurring at FECs more than tripled from 2012 to 2015.[2]   Clinical studies continue to show that shorter "door-to-physician" times and the individualized care received in FECs has resulted in clinical outcomes that are consistently better than those seen in traditional hospital emergency rooms. In fact, recent studies have shown that patients seen in an FEC can be admitted to a hospital, if necessary, faster than patients seen in the traditional emergency room attached to that same hospital. Patients seen first in an FEC experience a lower chance of readmission and better long-term outcomes than other patients and as a result, FECs consistently receive higher customer satisfaction scores.

38.     In short, FECs provide the communities they serve with unhindered access to emergency care while simultaneously realizing better clinical outcomes with greater efficiency and with a higher level of patient satisfaction.  Despite the clear benefits that FECs provide to their patients, including BCBS insureds, BCBS has actively tried to steer its insureds away from FECs and routinely refuses to reimburse FECs in the amounts required under state and federal law, as described below.

---

[2] https://www.annemergmed.com/article/S0196-0644(17)30473-0/pdf?code=ymem-site

**B.     BCBS Is Required to Provide Coverage for Emergency Services Regardless of Whether the Provider is In-Network or Out-of-Network.**

39.     BCBS, like many health insurers, contracts with healthcare providers to provide services to BCBS' insureds at pre-negotiated, discounted rates.[3]   Known as "in-network" providers, these contractual arrangements allow healthcare providers to generate additional business as a result of their "in-network" status and allows BCBS to pay lower rates for the medical treatment received by its insureds. "Out-of-network" providers, by contrast, do not have contractual arrangements with BCBS or other health insurers and, instead, set their own charges for services. For patients, seeing an in-network provider usually costs less than going to an out-of-network provider whose services are not discounted and may not even be covered by BCBS.

40.     Most FECs around the country, including the Plaintiffs and the Class, are out-of-network providers. Although many FECs have tried to work with BCBS in good-faith attempts to become in-network providers, BCBS refuses to offer the FECs, including Plaintiffs and the Class, realistic reimbursement rates that would sustain the facilities' operations. Unlike emergency departments attached to hospitals, FECs cannot offset lower reimbursement rates by admitting patients to the affiliated hospital or providing other supplemental treatment.

41.     Thousands of BCBS members receive treatment at FECs every year. This is not surprising: patients often cannot choose their provider in an emergency situation. Patients can be unconscious or otherwise incapacitated in an emergency, and in most cases, transported to the nearest emergency facility without regard to the facility's network status.

42.     To ensure patients always have access to emergency care, federal and state law require all emergency departments (including FECs) to treat all patients regardless of their

---

[3] As discussed above, BCBS also serves as an administrator for insurance plans funded by governmental entities in the State of Texas, as well as administers claims on behalf of sister Blue-Cross entities located in other states.

insurance coverage or ability to pay.  Texas law requires FECs to "provide to each patient, without regard to the individual's ability to pay, an appropriate medical screening, examination, and stabilization…to determine whether an emergency medical condition exists" and "provide any necessary stabilizing treatment."  25 TEX. ADMIN. CODE § 131.46; Tex. Health and Safety Code § 254.136.

43.    Similarly, the Federal Emergency Medical Treatment and Labor Act ("EMTALA") requires emergency physicians provide both a medical screening exam and the requisite care to individuals that present to an emergency department and request treatment or require care to stabilize their condition." 42 U.S.C. § 1395dd.  Emergency care providers must provide the required screening and/or stabilization to all patients seeking care regardless of either the patient's ability or willingness to pay or the "individual's method of payment or insurance status." *Id.*  Under EMTALA, emergency care providers cannot turn away a patient based on the type of insurance the patient has or its network status. Even if the emergency care provider knows the patient's insurance carrier does not have a contract with the emergency facility (*i.e.*, is out of network), the emergency care provider must treat and stabilize the patient.

44.    In turn, Texas law, federal law, and BCBS' own plans legally obligate BCBS to provide coverage for emergency medical services provided by out-of-network emergency departments like the Plaintiffs and the Class, as described below.

### i.    *Texas law requires BCBS to reimburse FECs*

45.    Numerous Texas statutes provide financial protection to patients who require emergency care from out-of-network providers and to healthcare providers who provide emergency care to patients who may not be able to afford it out of pocket.

46.    For instance, pursuant to the Texas Insurance Code, when out-of-network services are rendered due to an emergency, insurers must "provide reimbursement for" certain "emergency

care services at the preferred level of benefits until the insured can reasonably be expected to transfer to a preferred provider." TEX. INS. CODE § 1301.155; *see also* TEX. INS. CODE § 1271.155(b). The specific covered "emergency care services" include a "medical screening examination . . . that is necessary to determine whether a medical condition exists" and "necessary emergency care services, including the treatment and stabilization of an emergency medical condition." TEX. INS. CODE §§ 1301.55(b), 1271.55(b).

47.   The requirement that health insurers reimburse out-of-network emergency providers for services rendered applies regardless of a patient's final diagnosis. This coverage requirement stems from the fact that the Texas Insurance Code mandates coverage for "emergency care" deemed necessary from the perspective of a layperson seeking medical care—*i.e.*, "a medical condition of a recent onset and severity, including severe pain, that would lead a **prudent layperson** possessing an average knowledge of medicine and health to believe that the person's condition, sickness, or injury is of such a nature that failure to get immediate medical care" would place the person's health in serious jeopardy. TEX. INS. CODE § 1301.55(a) (emphasis added). Federal law likewise defines covered "emergency medical conditions" using a prudent layperson standard. 42 U.S.C. § 300gg-19a(b)(2)(A).

48.   Texas law also specifies the amount that insurers must pay out-of-network providers that provide emergency care services. The Texas Administrative Code specifies that, when emergency services are rendered to an insured by a nonpreferred provider, "the insurer must pay the claim, at a minimum, at the usual and customary charge for the service." 28 TEX. ADMIN. CODE § 3.3708(b). The Texas Insurance Code requires insurers to reimburse out-of-network providers "at the **usual and customary rate** or at a rate agreed to by the issuer and the nonpreferred provider for the provision of the services." TEX. INS. CODE § 1301.0053 (emphasis added); *see*

*also* TEX. INS. CODE § 1271.155(a) (requiring HMOs to "pay for emergency care performed by non-network physicians and providers at the usual and customary rate or at an agreed rate"). The Texas Insurance Code also prohibits an insurer or administrator like BCBS from reimbursing a provider "on a discounted fee basis for covered services" that are provided, unless contracted to do so. TEX. INS. CODE § 1301.056(a). As previously explained, emergency services—unlike most other healthcare services—are "covered services" by law. Importantly, under Texas law, the "usual and customary rate" refers to the amount the provider *charges* for its services, not what BCBS or another health insurer may have contracted to pay in-network providers.

49.     In addition to these statutory provisions, the Texas Prompt Pay Act protects FECs by requiring that insurers or administrators, like BCBS, timely respond to claims from healthcare providers. Specifically, the Prompt Pay Act requires that, upon submission of a "clean claim" meeting the applicable documentation requirements of standardized claim forms prior to 95 days after the date of service, the insurer must reimburse any portion of the provider's claims that are clean and/or issue a denial for any portion the insurer will not pay, within 45 days. Although the Texas Prompt Pay Act generally applies only to in-network providers, there is an exception for out-of-network providers, like Plaintiffs and the Class, who provide emergency services.

### ii.     *Federal law requires BCBS to reimburse FECs*

50.     Much like Texas law, federal law requires an insurer that "provides or covers any benefits with respect to services in an emergency department of a hospital" to also cover similar "emergency services" provided by an out-of-network provider regardless of the individual's method of payment or insurance status.  42 U.S.C. §§ 300gg-19a(b)(1); 1395dd(a), (b), (e)2, (h). All BCBS plans provide coverage for emergency services.  Indeed, under the Affordable Care Act, emergency services are listed as one of the ten "essential health benefits" to be included in health insurance plans. 42 U.S.C. § 18022(b)(1).

51.   Federal law also sets parameters for the amount of reimbursement in these situations. Specifically, insurers must reimburse out-of-network providers at the greater of:

> (A)   The amount negotiated with in-network providers for the emergency service furnished;
>
> (B)   The amount for the emergency service calculated using the same method the plan generally uses to determine payments for out-of-network services (such as the **usual, customary, and reasonable amount**); or
>
> (C)   The amount that would be paid under Medicare (part A or part B of title XVII of the Social Security Act, 42 U.S.C. 1395 et seq.) for the emergency service.

26 C.F.R. § 54.9815-2719AT(b)(3); 29 C.F.R. § 2590.715-2719A(b)(3) (emphasis added); 45 C.F.R. § 147.138(b)(3).

### iii.   *The BCBS Plans require BCBS to reimburse FECs*

52.   Consistent with the requirements imposed by Texas and federal law, BCBS plans and plans administered by BCBS provide their insureds with coverage for "Emergency Care," defined as:

> health care services provided in a Hospital emergency facility, **freestanding emergency medical care facility**, or comparable facility to evaluate and stabilize medical conditions of a recent onset and severity, including but not limited to severe pain, that would lead a **prudent layperson**, possessing an average knowledge of medicine and health, to believe that his condition, sickness, or injury is of such a nature that failure to get immediate medical care could result in: placing the patient's health in serious jeopardy; serious impairment to bodily functions; serious dysfunction of any bodily organ or part; serious disfigurement; or in the case of a pregnant woman, serious jeopardy to the health of the fetus.

53.   Unlike with normal out-of-network services, the BCBS Plans expressly provide for insurance coverage to their members who receive Emergency Care from an out-of-network provider, such as Plaintiffs and the Class. For instance, BCBS PPO Plans state that they "provide[] coverage for medical emergencies wherever they occur." The HMO Plans state that "Emergency

Care services whether rendered by a Participating or non-Participating Providers [sic] will be covered, based upon the signs and symptoms presented at the time of treatment."

54.     The BCBS PPO Plans require reimbursement of out-of-network emergency care providers, like Plaintiffs and the Class, at the same percentage of the Allowable Amount as an in-network provider. The Allowable Amount for emergency care is set at "the usual or customary amount as defined by Texas law or as prescribed under applicable law or regulations."

55.     Similarly, the BCBS HMO Plans provide that for out-of-network emergency care providers, like Plaintiffs and the Class, the Allowable Amount shall be the greatest of the following rates: (1) the median amount negotiated with Participating Providers for Emergency Care services furnished; (2) the amount for the Emergency Care service calculated using the same method the Plan generally uses to determine payments for non-Participating Provider services by substituting the Participating Providers cost-sharing provisions for the non-Participating Providers cost sharing provisions; (3) the amount that would be paid under Medicare for the Emergency Care; or (4) the agreed rate, or the usual and customary rate.

### iv.     *The "usual and customary rate"*

56.     The "usual and customary rate" under Texas law—which is also generally the highest under the federal "greater of three" standard—is an amount that is based on what providers in the same geographic area usually charge for the same or similar service.  Texas law requires that insurers and/or adminstrators calculate the "usual and customary rate" based on "generally accepted industry standards and practices for determining the customary **billed charge** for a service and that fairly and accurately reflects market rates, including geographic differences in cost."  28 TEX. ADMIN. CODE § 3.3708(c)(1).

57.     However, insurers and/or their administrators often make their own decision about what they believe a "usual and customary rate" is without disclosing the data or rationale

underlying that decision. Upon information and belief certain insurers, including BCBS, have purported to use Medicare rates to calculate what is usual and customary. But, as the TDI has noted, the Medicare rates are "not based on billed charges or usual and customary data." Texas Department of Insurance, *Usual and Customary Survey* at 10-11 (Revised Jan. 2017).[4]

58.     Nonetheless, there are a several independent, conflict-free third parties that provide information regarding usual and customary rates. The most prominent of these third parties is FAIR Health—an independent nonprofit that collects data for and manages the nation's largest database of privately billed health insurance claims.  FAIR Health cost estimates are based on provider charge data submitted in claims by those providers for the payment of medical services rendered to their patients that have private insurance plans, including the country's largest insurers. In total, FAIR Health maintains a database of more than 27 billion claims and adds nearly 1.7 billion new claims every year. The Texas Department of Insurance has recognized FAIR Health data as "geographically adjusted, updated every six months, and based on non-discounted billed charges." *Id.* at 11.

59.     As a result, when attempting to set the prices for the emergency services they render, many FECs use a methodology that utilizes FAIR Health's charge database (or a similar resource) to determine what similarly situated providers in their geographical location customarily charge for a specific service a particular point in time.

## C.     BCBS' Numerous Schemes to Underpay Emergency Medical Providers

60.     BCBS has repeatedly ignored its obligations under Texas law, federal law, and the terms of its own plans to timely provide coverage at the usual and customary rate for BCBS

---

[4] *Available at*: https://www.tdi.texas.gov/reports/life/documents/ucreport.pdf

members who present for emergency care at FECs, including Plaintiffs and the Class.

61.     Plaintiffs and the Class have treated tens of thousands of patients insured by BCBS (or its sister Blue-Cross entities in other states), or insured by plans administered by BCBS, and accordingly billed BCBS for services provided to these patients. Plaintiffs' and the Class' total charges for these claims reflect the usual and customary fees for their particular geographical region for the particular medical services provided at those facilities.

62.     However, to date, BCBS has only paid a fraction of the amount it is legally required to provide for these claims. Indeed, for some patients who received treatment at FECs, BCBS provided zero coverage as they have threatened to do in various press releases. *See* https://www.houstonpublicmedia.org/articles/news/2018/06/04/288825/blue-cross-blue-shield-of-texas-delays-controversial-change-after-backlash/.

63.     After deducting charges that are the patients' responsibility under the BCBS Plans—*i.e.*, copayments, coinsurance, and deductibles—BCBS has failed to pay hundreds of millions of dollars in usual and customary charges for emergency medical claims provided by the class members in Texas at FECs during the relevant period.

64.     In theory, when a patient is experiencing medical symptoms, there is a simple two-step process to seek treatment in a potential emergency scenario.  First is application of the prudent layperson standard:  Would an average knowledge of medicine and health to believe that the person's condition, sickness, or injury is of such a nature that failure to get immediate medical care would place the person's health in serious jeopardy?  If so, then they should seek care without delay.  Second, if the emergency care provider is out-of-network, then the provider should be reimbursed pursuant to the greater-of-three requirement, *i.e.* the usual and customary rate for the services provided in that locale.

18

65.     However, BCBS has attacked what should otherwise be a relatively simple process on both fronts and has engaged in a systematic scheme designed to underpay, not pay, or delay payment to emergency health-care providers, including the Class. BCBS regularly covers only a fraction of the charges for the services provided to patients with plans provided or administered by BCBS at FECs, including Plaintiffs and the Class, which are billed out at the usual and customary rate.

66.     BCBS' reimbursement methods are not transparent, not based on peer-to-peer costs, and are inconsistent with the benchmark rates reported by FAIR Health, which the Texas Department of Insurance ("TDI") has looked to in defining what is usual and customary. In fact, BCBS refuses to explain how it arrives at its allowable amounts, even when specifically asked by providers trying to settle claims.

67.     BCBS has used multiple schemes to underpay for services provided by FECs, including Plaintiffs and the Class, in what appears to be a systematic effort to drive freestanding emergency rooms out of business.

68.     First, BCBS has often refused to pay claims at the amounts required by the terms of the BCBS Plans and applicable law under the guise of the false, vague, and nonsensical representation that the "Charge exceeds fee schedule/maximum allowable or contracted/legislated fee arrangement." FECs, including the Class, as assignees of BCBS member claims, regularly receive explanation of benefit forms ("EOB") containing that reason for nonpayment together with the corresponding claim adjustment code "PR-45."

69.     The PR-45 code allows BCBS to avoid payment of billed charges without technically denying the claims, but instead "allowing" the claim for zero dollars or a fraction of the billed amount. Accordingly, for many FECs the severe underpayment is not automatically

flagged because the claims show up as "paid" rather than "denied."

70.     BCBS knows, or at the very least should know, that these representations are false: BCBS has no "contracted" rate with FECs, including the Class, and there is no "legislated" fee arrangement beyond the reasonable-and-customary and greater-of-three requirements discussed above, which are reflected in the Plaintiffs' and the Class' charges. BCBS has regularly paid claims at rates other than what is usual and customary.

71.     BCBS has regularly utilized the PR-45 code to pay claims at rates other than what is usual and customary. For example, BCBS member R.S. presented to an FEC, Plaintiff America's ER Site 001, LLC, on January 6, 2019 with abdominal pain and was ultimately diagnosed with pancreatitis, an elevated white blood cell count, hypertension, and abnormal liver production. While at the FEC, R.S. received a CT scan of the abdomen, underwent lab work, received numerous IV treatments and medications, and was held under emergency room observation at a Level 4 visit for four hours. The charges for the care, which were billed out at the usual and customary rate, were $11,099.20. Yet BCBS, under the guise of the "PR-45" code, *refused to reimburse anything* thus leaving its insured R.S. responsible for the entire bill. BCBS cannot maintain that zero dollars was the usual and customary rate for services in this clearly emergent situation.

72.     Likewise, a BCBS member named L.G. presented to a FEC, Plaintiff America's ER Site 001, LLC, on November 17, 2018 for treatment. She was diagnosed, received a CT scan, and was held under observation for six hours. The charges for the care, which were billed out at the usual and customary rate, totaled $22,829.05. But BCBS only paid $990.00—*i.e.*, *four percent of the charges*—leaving L.G. (BCBS's insured) liable to pay the remaining $21,839.05. BCBS did not contest that there was an emergency or that the treatment was medically necessary; instead,

it arbitrarily stated that the charged rates exceeded BCBS's maximum fee schedule.  This behavior clearly violates both state and federal law and harms not only the FECs and their associated physicians groups, but also BCBS' patients.

73.    Similarly, BCBS' insured M.J. presented at an FEC, Plaintiff Excel ER Physicians East Texas PLLC, with extreme chest pain and was ultimately diagnosed with pneumonia and pleurisy after an EKG and chest x-ray.  The FEC submitted a claim to BCBS for $1,638.40, which was billed at the usual and customary rate consistent with the Fair Health database for those services. Nonetheless, BCBS only agreed to reimburse $82.72, an amount far more consistent with the Medicare rate than with the usual and customary rate charged.

74.    BCBS' insured C.W. presented at an FEC, Plaintiff Piney Woods ER III, LLC, for severe pain and swelling in the hand and following an x-ray was placed in a splint.  The FEC submitted a claim to BCBS for $2,104.53, which was billed at the usual and customary rate consistent with the Fair Health database for those services. Nonetheless, BCBS only agreed to reimburse $71.32, an amount far more consistent with the Medicare rate than with the usual and customary rate charged.

75.    Likewise, BCBS' insured J.H. presented at an FEC, Plaintiff Piney Woods ER I, LLC, for severe abdominal pain and intractable vomiting and was ultimately diagnosed with a urinary tract infection, dehydration and renal atrophy following blood work, urinalysis, a CT scan and IV fluids and medication. The FEC submitted a claim to BCBS for $21,497.05, which was billed at the usual and customary rate consistent with the Fair Health database for those services. Nonetheless, BCBS only agreed to reimburse $801.02, an amount far more consistent with the Medicare rate than with the usual and customary rate charged.

76.    These are just examples of BCBS's systematic effort to underpay.  BCBS has

similarly underpaid all FECs, including Plaintiffs and the Class.

77.     In these instances, BCBS puts the FEC in a bind between charging (and alienating) their patients or taking the hit and receiving nothing for the services provided. BCBS does not explain *why* the FEC facilities charges exceeded a "legislated fee arrangement" or *how* BCBS calculates its own rate. Rather, BCBS' PR-45 representations are false, do not comply with Texas Insurance Code or ERISA regulations requiring insurers and/or adminstrators to state the specific and/or actual reasons for refusing to pay claims.

78.     Second, upon information and belief, BCBS has used a reimbursement methodology based on Medicare rates to underpay claims for services billed out at usual and customary rates. Medicare rates are not usual and customary and are not even sufficient for FECs, including Plaintiffs and the Class, to maintain a viable business.

79.      As discussed above, Medicare rates are "not based on billed charges or usual and customary data," as the TDI has recognized. BCBS' use of Medicare rates in calculating reimbursements fails to account for "industry standards and practices" and fails for determining the customary billed charge for a service that fairly and accurately reflects market rates, including geographic differences in cost.

80.     There are numerous instances of BCBS using what appears to be Medicare rates to pay claims at non-usual and customary rates. For instance, when BCBS's insured M.K. received treatment at an FEC, Plaintiff America's ER Site 001, LLC, for persistent asthma with acute exacerbation, the FEC submitted a claim to BCBS for $3,156.32, which was billed at the usual and customary rate consistent with the Fair Health database for those services. Nonetheless, BCBS only agreed to reimburse $486.57, an amount far more consistent with the Medicare rate than with the usual and customary rate charged.

81.     BCBS' practice of using Medicare rates to determine its reimbursement amounts contravenes the terms of the BCBS Plans and applicable law and deprives FECs, including Plaintiffs, of the payment for the services provided to patients with plans provided or administered by BCBS.

82.     Third, BCBS has instituted systematic internal systems such as the "peer-to-peer" review system" and the so called "Emergency Benefit Management" review process as mechanisms to specifically delay and avoid reimbursement to FECs, including the Class.

83.     Specifically, BCBS regularly responds to claims from FECs by sending letters requesting that the treating physician set up a meeting with a BCBS-hired doctor to explain the medical necessity of the treatment provided. BCBS provides the FEC with ten days to respond or else forfeit the right to appeal. But the FECs often do not receive the letters in time to respond, and the treating physicians—whose job is to treat patients in emergency situations—often do not have the time to spend their day communicating with insurers. To make matters worse, BCBS refuses to allow coding experts from the FECs to participate in the "peer-to-peer" meetings.

84.     Additionally, the EBM review process has resulted in more than 80% of claims examined by the TDI to not be timely processed.  As a result of this and other failures by BCBS related to the processing of emergency care claims, the TDI fined BCBS $10.0 million in the form of an administrative penalty on March 6, 2020 and ordered it to pay restitution.

**D.     Plaintiffs Have Exhausted Their Remedies**

85.     Plaintiffs and the Class have complied with all conditions precedent to bringing this lawsuit, including exhaustion of administrative remedies. For the claims at issue in this lawsuit, FECs have either filed appeals to BCBS or else declined to because doing so would be futile.

86.     When the FECs have filed appeals to BCBS, BCBS has routinely denied the appeal without any substantive explanation or simply failed to respond to the appeal at all. Specifically,

BCBS has failed or refused to provide: written notice of benefit determination within ninety days of claim submission; the specific reasons for denying the claim; the specific plan provisions relied on to support the denials; or the specific rule or guideline relied on to make the denial decision as required by 9 CFR § 2560.503-1(g). Likewise, BCBS has refused to provide supporting documentation or explain how it arrives at its reimbursement rates.  As a result, administrative remedies are deemed exhausted "in the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section."  *See* 29 CFR § 2560.503-1(l).

87.    As far as Plaintiffs' are aware, in all of the appealed cases by Plaintiffs, BCBS has yet to reverse its decision and pay the FEC at the usual and customary rate for the services provided as reflected in the billed amount, consistent with the FAIR Health database.  This demonstrates the futility of the appeals process and is clear evidence of the bias and hostility of BCBS and its review committee against FECs, including Plaintiffs and the Class.

88.    BCBS' tactics have prevented the FECs, including Plaintiffs, from engaging in an actual and good faith appeals process necessary to obtain reimbursement at the usual and customary rate required by both ERISA and Texas state law. In cases where the internal appeal process may not have been exhausted, full exhaustion is excused because the appeals process would be futile because a review of the Plaintiffs' own appeals history clearly demonstrates that in 100% of the claims actually appealed, BCBS failed to reimburse Plaintiffs at the usual and customary rate as reflected by the Fair Health database.  As such, the actions of BCBS clearly demonstrate actual bias and hostility towards FECs.

**E.    Plaintiffs Have Suffered Significant Damages**

89.    The negative financial impact of BCBS' has been devastating to Plaintiffs' and the Class' businesses.  BCBS has launched an aggressive, targeted campaign against FECs in an attempt to put the industry out of business.  For example, BCBS has adjusted its patient co-pays to

discourage their use.  BCBS has sent false benefit information in an effort to confuse and scare patients away from FECs.  Combined with the systematic underpayment of claims and delayed payment of claims, the financial stress BCBS is attempting to exert on FECs is significant.

90.     Both the percentage of billed charges paid by BCBS as well as total patients visits has been in steady decline over the past four years as a result of BCBS' efforts.  As a result, many FECs such as Plaintiffs Piney Woods ER III, LLC and Piney Woods ER I, LLC have ceased operations.  Many more FECs have also closed operations.

91.     As a result, Plaintiffs seek, on behalf of themselves and the Class, damages in the following amount:  The usual and customary charges billed for all emergency services provided during the class period, less any required patient co-pays or deductible les required by the applicable plan, less any amount previously reimbursed by BCBS to the class members.

92.     In addition, Plaintiffs seek, on behalf of themselves as well as the Class, all other applicable damages including treble damages, penalties, interest, attorneys' fees, etc. provided under Texas state or federal law.

## CLASS ACTION ALLEGATIONS

93.     The allegations set forth above are incorporated herein by reference.

94.     Plaintiffs bring this action as the representatives of a proposed Class pursuant to Fed. R. Civ. P. 23(b)(3).  The proposed Class is comprised of:

> All out-of-network, free-standing emergency centers in Texas, and physician groups operating out of same, who submitted allowed claims for reimbursement to BCBS for emergency care for the six-year period preceding the filing of this complaint.

> The following persons are excluded from the Class: (1) the judge(s) assigned to this case and his or her staff; (2) governmental entities; (3) any Defendants and their affiliates; (4) persons adjudged to be bankrupt; and (5) persons who previously released Defendants of the claims raised by this case.

95.     Upon information and belief, absent Class members entitled to full reimbursement by BCBS at the usual and customary rate for emergency care number at least in the hundreds. Therefore, the Class is so numerous that joinder of all members is impracticable.

96.     The questions of fact and law common to the Class, include but are not limited to:

a.     Whether BCBS had a duty to reimburse Plaintiffs and the Class at the usual and customary rate for emergency care rendered;

b.     How the usual and customary rate is determined;

c.     Whether BCBS' failure to pay a usual and customary rate violated ERISA;

d.     Whether BCBS' failure to pay a usual and customary rate constituted a breach of BCBS Plans;

e.     Whether BCBS tortiously interfered with Plaintiffs' and the Class' prospective business relations by disseminating misinformation to insureds regarding out-of-network healthcare providers;

f.     Whether BCBS has a duty of good faith and fair dealing to Plaintiffs and the Class;

g.     Whether BCBS' payment practices violated its duty of good faith and fair dealing;

h.     Whether BCBS had a duty of reasonable care to Plaintiffs and the Class regarding representations made during the claims process;

i.     Whether standard representations made by BCBS during claims processes violated its duty of care;

j.     Whether BCBS defrauded Plaintiffs and the Class by knowingly reimbursing less than the usual and customary rate; and

k.     Whether any appeal by any FEC would be futile.

97.     Plaintiffs' claims are typical of the Class' claims because the claims are identical for each Class member, arise from the same underlying facts, and are based on the same legal theories.  BCBS treated Plaintiffs and the Class in the same way by failing to reimburse Plaintiffs and the Class at the usual and customary rate for emergency care services.

98.     Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs' interests do not conflict with the interests of the Class.  Plaintiffs are represented by counsel who are skilled and experienced in insurance matters, complex civil litigation, and class action litigation.

99.     The averments of fact and questions of law herein, which are common to the members of the Class, predominate over any questions affecting only individual members.

100.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy for the following reasons:

   a.    The questions of law and fact are so uniform across the Class that there is no reason why individual members of the Class would want to control the prosecution of their own actions, at their own expense;

   b.    To Plaintiffs' knowledge, there is no pending litigation by any individual Class member, with the same scope of Class membership sought herein, against BCBS relating to BCBS' failure to reimburse out-of-network emergency care services at a usual and customary rate as required by law;

   c.    The interests of all parties and the judiciary in resolving these matters in one forum without the need for multiplicity of actions is great; and

   d.    The difficulties in managing this case as a class action will be slight in relation to the personal benefits to be achieved on behalf of each and every Class member, and not just those who can afford to bring their own actions.

## CLAIMS FOR RELIEF

101.    The underlying health insurance plans provided and/or administered by BCBS (including the plans of BCBS's sister entities in other states that are administered by BCBS in Texas) can be divided into two categories:  self-funded ERISA plans fully funded by the underlying employer that are subject to federal preemption and those plans that are not self-funded ERISA plans.

102.    There is no mechanism for a FEC to determine whether a particular plan is a self-funded ERISA plan or not based upon the plan group number.  By contrast, BCBS is the holder of the information necessary to determine whether or not the plan governing a particular claim for reimbursement made by the Plaintiffs or a member of the putative class is a self-funded ERISA plan or not.  As a result, BCBS alone can determine what underlying plan governs.

### Count One: Violations of ERISA Payment Obligations

103.    The allegations set forth above are re-alleged and incorporated as if set forth fully herein.

104.    This is a claim to recover benefits, enforce rights, and clarify rights to benefits under section 502 of ERISA, with respect to BCBS Plans that are "welfare benefit plans" to which ERISA applies. Section 502 allows a participant or beneficiary covered by a welfare plan to sue to "recover benefits due . . . under the terms of his plan, to enforce rights under the terms of the plan, or to clarify . . . rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

105.    FECs are the assignees of health care benefits to which patients with plans provided or administered by BCBS are entitled under ERISA plans. Therefore, Plaintiffs and the FECs in the putative Class are entitled to recover benefits due under the terms of BCBS Plans. Plaintiffs have standing as a participant or beneficiary pursuant to assignments to assert the claims of their assignors against BCBS.

106.    BCBS either serves as the named plan administrator or the designated plan administrator's "designee" for the various ERISA plans at issue or exercises discretion and control over the payment of plan benefits.

107.    As the exemplar plans discussed above demonstrate, BCBS Plans provide that BCBS will reimburse out-of-network emergency services at specified levels. For instance, the

exemplar BCBS PPO Plan sets the Allowable Amount for emergency care at "the usual or customary amount as defined by Texas law or as prescribed under applicable law or regulations." And the exemplar BCBS HMO Plan sets the Allowable Amount for emergency care at the greatest of four rates, which includes the "usual and customary rate."

108.    BCBS has violated the plain terms of the BCBS Plans and abused its discretion in administration of the plans at issue by significantly underpaying claims for the out-of-network services provided to patients from FECs, including Plaintiffs and the Class.  BCBS has failed to remit payment for those claims at the usual and customary level that its plans require.

109.    BCBS has also violated the ACA's greater-of-three requirement by failing to provide benefits for emergency care in an amount at least equal to the greatest of: (1) amount negotiated with in-network providers; (2) the amount for the emergency service calculated using the same method the plan generally uses to determine payments for out-of-network services (such as the usual, customary, and reasonable amount); and (3) the amount paid under Medicare.  *See* 45 CFR § 147.138(b)(3).  The greater-of-three requirement is enforceable via a claim for ERISA benefits under section 502(a)(3) of ERISA.  *See* 29 U.S.C. § 1132(a)(3); 29 U.S.C. § 1185d(a)(1).

110.    Plaintiffs and the putative Class have exhausted their administrative remedies under the ERISA plans at issue. For the underpaid claims that are subject to ERISA, Plaintiffs either submitted timely written appeals to BCBS pursuant to 29 U.S.C. § 1133, or are excused from exhausting their administrative remedies because BCBS failed to follow claims procedures required by ERISA and its implementing regulations. *See* 29 C.F.R. § 2560.503-1. Alternatively, exhaustion of administrative remedies was not required because it was futile as demonstrated by the bias and hostility of BCBS and its review committee against FECs.

111.     BCBS' conduct constitutes a breach of the ERISA plans and an abuse of discretion. Such conduct has denied Plaintiffs and the Class benefits to which they are entitled. Under the terms of the BCBS Plans, BCBS members are entitled to a benefit consisting of coverage for emergency care and payment consistent with the plan document and other legal requirements.

112.     BCBS' failure to pay Plaintiffs and the Class what it was obligated to pay for the emergency care provided to patients was motivated by BCBS' desire to achieve maximum profits and constitutes a conflict of interest and bad faith.

113.     As assignee of the benefits to which patients with plans provided or administered by BCBS are entitled pursuant to their ERISA Plans, Plaintiffs and the Class are entitled to the recovery of benefits and all other relief due pursuant to 29 U.S.C. § 1132(a)(1)(B).

**Count Two: Breach of Contract**

114.     The allegations set forth above are re-alleged and incorporated as if set forth fully herein.

115.     Plaintiffs and the Class provided medically necessary emergency services to BCBS members enrolled in plans and/or insurance contracts that are not covered by ERISA. BCBS members assigned their benefits under these plans and/or insurance contracts to the Plaintiffs and the Class. Plaintiffs and the Class, therefore, have standing in their capacity as assignee to enforce the terms of the non-ERISA BCBS Plans.

116.     Pursuant to BCBS Plans, BCBS agreed to pay out-of-network providers, such as Plaintiffs and the Class, using a specified payment methodology (usually the usual and customary rate). Plaintiffs and the Class provided covered services to BCBS insureds, and those insured assigned their insurance contract benefits to Plaintiffs and the Class.

117.    The FECs submitted claims to BCBS for payment for medically necessary emergency services. However, BCBS failed to pay the FECs, including Plaintiffs and the Class, in accordance with the terms of the insurance contracts.

118.    BCBS' failure to pay the Plaintiffs and the Class at the amounts required by the BCBS Plans constitutes a breach of contract.

119.    As a direct and proximate result of BCBS' breaches of contract, Plaintiffs and the Class have been damaged in an amount in excess of the jurisdictional floor of the Court. Plaintiffs and the Class are entitled to full payment due from BCBS.

**Count Three: Bad Faith Insurance Practices**

120.    The allegations set forth above are re-alleged and incorporated as if set forth fully herein.

121.    As the insurer of fully insured policies, BCBS owed a duty of good faith and fair dealing to its insureds under the insurance policies. Plaintiffs and the Class are the assignees and beneficiaries for each of the insurance policies at issue.

122.    BCBS breached its duty by failing to provide full payment on Plaintiffs' and the Class' assigned insurance claims when BCBS' liability was reasonably clear. Moreover, to the extent BCBS conducted "investigations" to make coverage determinations, such "investigations" were merely a pretext to deny full coverage. Such conduct constitutes bad faith and has proximately caused damages to Plaintiffs and the Class as the assignee and beneficiary of the fully insured plans issued by BCBS.

123.    Plaintiffs and the Class are entitled to recovery of actual, economic damages, as well as exemplary damages, pre-judgment and post-judgment interest, and attorneys' fees.

**Count Four: Negligent Misrepresentation**

124.    The allegations set forth above are re-alleged and incorporated as if set forth fully herein.

125.    Throughout the claims process, BCBS—either as an insurer, third-party administrator, or "Host Plan" to its sister Blue-Cross entities in other states—would provide numerous representations to Plaintiffs and the Class as an assignee of the insureds' claims. Specifically, BCBS would provide explanation of benefits ("EOBs") stating its reason for not providing full reimbursements on the insureds' claims. Additionally, when Plaintiffs and the Class or their agents appealed BCBS' coverage determinations, BCBS would sometimes provide additional representations explaining the purported reasons for which it was denying coverage. These representations were made to guide the insureds and their beneficiaries in seeking insurance benefits.

126.    The representations that BCBS made to Plaintiffs and the Class (as assignees of the insureds' claims) were repeatedly false.  By way of example, BCBS often represented that it was denying coverage because:

- there was no "medical necessity" for the medical care the insured received, when, in fact, a prudent layperson possessing an average knowledge of medicine and health would have reason to believe emergency medical care was needed;

- the insured sought reimbursements that "overcharged" BCBS or were inconsistent with the usual and customary rates, when, in fact, the reimbursements sought were consistent with the usual and customary rates;

- the insured failed to undertake a "coordination of benefits" by notifying BCBS of other insurance coverage, when, in fact, a failure to coordinate benefits would not have relieved BCBS' obligation to provide coverage;

- the submitted claims had "coding" or "billing" errors, when such errors did not exist or were not a basis for denying coverage;

- the submitted claims were inconsistent with the insurance policy, when, in fact, they were not and the Texas Insurance Code required payment on the claims.

127.    Upon information and belief, BCBS did not exercise reasonable care or competence in communicating this information to the insureds and their beneficiaries. Rather, BCBS would simply put down stock responses or provide EOBs that had no connection to the claims or no basis under the plans. On information and belief, and as demonstrated by BCBS' public campaigns against FECs, BCBS often made these representations knowing they were inaccurate and with the intent to deprive Plaintiffs and the Class of the ability to obtain full payment for the services they provided.

128.    Plaintiffs and the Class (as assignees of the insureds' claims) relied on BCBS' misrepresentations in attempting to determine coverage information for their patients. Based on the misrepresentations, Plaintiffs and the Class were unable to obtain reimbursements when they were entitled to them.

129.    As a direct and proximate result of its reliance on BCBS' misrepresentations, Plaintiffs and the Class have been harmed in an amount in excess of the jurisdictional floor.

## Count Five: Declaratory Judgment

130.    The allegations set forth above are re-alleged and incorporated as if set forth fully herein.

131.    As mentioned above, the Texas Insurance and Administrative Codes impose a number of requirements on providers when determining the allowed reimbursement amount for care rendered in emergency situations.   Protections afforded by the Texas Insurance Code are largely instituted to protect Texas consumers of medical insurance policies.   To begin, Chapter 1301 of the Texas Insurance Code pertains to Preferred Providers and out-of-network providers, along with FECs duly licensed under Chapter 254 of the Texas Health and Safety Code.   Similarly,

Chapter 1271 of the Texas Insurance Code applies to HMOs.  Under both chapters, BCBS is required to reimburse FECs at the usual and customary rate.

132.     For emergency claims falling under the requirements of Chapter 1301 of the Texas Insurance Code, the reimbursement amounts for emergency care must be read in conjunction with the Texas Administrative Code.  *See* TEX. ADMIN. CODE § 3.3701.  Insureds are entitled to freedom of choice not only when electing preferred providers, but insureds must also "have the right to emergency care services as set forth in Insurance Code…§1301.155, §3.3708 of this title (relating to Payment of Certain Basic Benefit Claims and Related Disclosures)..."  *See* TEX. ADMIN. CODE § 3.3701(5) and (7) (stating that the "rights of an insured to exercise full freedom of choice in the selection of a physician" is not restricted by the insurer).

133.     Section 1301.155 referenced above relates to emergency care rendered to an insured when a preferred provider cannot be reached, and the insured believes under the prudent layperson standard that immediate medical care is required.  *See* TEX. INS. CODE § 1301.155.  As a preliminary matter, Texas Insurance Code § 1301.056 prohibits BCBS from reimbursing FECs on a "discounted fee basis." *See* TEX. INS. CODE § 1301.056.  On top of this prohibition, Texas Administrative Code § 3.3708 requires BCBS to pay FECs providing emergency care the usual and customary rate less any patient coinsurance, copayment, or deductible responsibility under the plan.  *See* TEX. ADMIN. CODE § 3.3708.  Additionally, the usual and customary rate amount is to be "based on generally accepted industry standards and practices for determining the customary billed charge for a service and that fairly and accurately reflects market rates, including geographic differences in costs."  *Id.* at (c)(1).

134.     Similarly, HMOs are required to "pay for emergency care performed by non-network physicians or providers at the *usual and customary rate* or at an agreed rate." *See* TEX. INS. CODE § 1271.155 (emphasis added).

135.     And BCBS' own insurance plans and the plans BCBS administers require coverage of insureds for emergency care at the "usual and customary rate," including emergency care provided by out-of-network providers.

136.     Despite the clear requirement to reimburse FECs who render care in emergency situations at usual and customary rates, BCBS engages in practices to obfuscate the allowable reimbursable amount being paid to FECs with the clear intention of avoiding payment in accordance with usual and customary rates.

137.     Likewise, BCBS has also violated the ACA's greater-of-three requirement by failing to provide benefits for emergency care in an amount at least equal to the greatest of: (1) amount negotiated with in-network providers; (2) the amount for the emergency service calculated using the same method the plan generally uses to determine payments for out-of-network services (such as the usual, customary, and reasonable amount); and (3) the amount paid under Medicare.  *See* 45 CFR § 147.138(b)(3). The greater-of-three requirement is enforceable via a claim for ERISA benefits under section 502(a)(3) of ERISA. *See* 29 U.S.C. § 1132(a)(3); 29 U.S.C. § 1185d(a)(1).

138.     To correct these improper actions and violation of statutes, Plaintiffs and the Class seeks a declaratory judgment from this Court determining its rights to reimbursement for services rendered at the usual and customary rate and in proper accordance with the above-mentioned statutes and BCBS' own contractual obligations. 28 U.S.C. § 2201.

139.    A declaratory judgment is proper when the question of construction of statutes is necessary to determine a party's rights and obligations. *See id.* In addition to determining BCBS' reimbursement requirements as set forth in the applicable statutes, Plaintiffs and the Class also seek a declaratory judgment that damages, in an amount to be determined at a trial on the merits, is owed in addition to costs and attorneys' fees.

### JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

### PRAYER FOR RELIEF

Wherefore, premises considered, Plaintiffs seek:

1.    An order certifying and allowing this case to proceed as a class action with Plaintiffs as class representatives and the undersigned counsel as class counsel;

2.    An order requiring Defendant to pay Plaintiffs and Class members actual damages to fully compensate them for losses sustained as a result of Defendant's breaches and/or unlawful conduct;

3.    An order awarding Plaintiffs and Class members restitution in an amount of the benefit wrongly and/or unlawfully obtained by Defendant;

4.    An order awarding punitive and/or exemplary damages;

5.    A declaratory judgment in favor of Plaintiffs finding and determining that:

   i.   The Texas Insurance Code and Texas Administrative Code require Defendant to reimburse Plaintiffs and the Class at a usual and customary rate;

   ii.  Defendant must base the usual and customary rate at which it reimburses Plaintiffs and the Class "on generally accepted industry standards and practices for determining the customary billed charge for a service and that fairly and accurately reflects market rates, including geographic differences in costs";

      iii.  Defendant failed to pay Plaintiffs and the Class at usual and customary rates; and

      iv.  Plaintiffs and the Class are entitled to damages from Defendant, in an amount to be determined at a trial on the merits, and all other appropriate relief.

6.     An order requiring Defendant to pay costs and expenses of this lawsuit, including reasonable attorneys' fees incurred by Plaintiffs in prosecuting this action;

7.     Pre-judgment and post-judgment interest to the extent allowed by law; and

8.     Such costs and further relief as this Court deems appropriate.

Respectfully Submitted,

*/s/ Andrew G. Pate*
Bradley E. Beckworth, TX Bar No. 24001710
C. Cary Patterson, TX Bar No. 15587000
Jeffrey Angelovich, TX Bar No. 00786988
Lisa P. Baldwin, TX Bar No. 24069334
Trey Duck, TX Bar No. 24077234
Andrew G. Pate, TX Bar No. 24079111
Ross Leonoudakis, TX Bar No. 24087915
Robert "Winn" Cutler, TX Bar No. 24084364
Jessica E. Underwood, TX Bar No. 24093291
Katherine L. Beran, TX Bar No. 24097295
NIX PATTERSON, LLP
3600 North Capital of Texas Highway
Suite 350, Building B
Austin Texas, 78746
Telephone:  (512) 328-5333
Facsimile:  (512) 328-5335
*bbeckworth@nixlaw.com*
*ccp@nixlaw.com*
*jangelovich@nixlaw.com*
*lbaldwin@nixlaw.com*
*tduck@nixlaw.com*
*dpate@nixlaw.com*
*rossl@nixlaw.com*
*winn.cutler@nixlaw.com*
*junderwood@nixlaw.com*

*kberan@nixlaw.com*

**Walston Bowlin, LLP**
CLIFFORD H. WALSTON
cliff@walstonbowlin.com
State Bar No. 24037666
Co-Lead Counsel
JOSHUA N. BOWLIN
Texas State Bar No. 24036253
 josh@walstonbowlin.com
4299 San Felipe Street, Suite 300
Houston, Texas 77027
(713) 300-8700
(713) 583-5020 Fax

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2021, a true and correct copy of the above and foregoing document was served in accordance with the Local Rules on all counsel of record through the Court's CM/ECF filing system.

/s/ Andrew G. Pate
Andrew G. Pate